Sealed
Public and unofficial staff access to this instrument are prohibited by court order.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MAY 09 2012

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| VS. | § § | CRIMINAL NO. 12-272 |
| TERRY GLENN SILLERS, | § § | COUNT I: 18 U.S.C. § 1962(d): Conspiracy to Participate in a Racketeering Enterprise |
| a/k/a "Lil Wood" Defendant | § § § | |

# INDICTMENT

## COUNT ONE

### (Conspiracy to Participate in Racketeering Activity)

THE UNITED STATES GRAND JURY CHARGES:

#### Introduction

1. At various times relevant to this Indictment, the defendant and others known and unknown, were members of the Aryan Brotherhood of Texas (hereinafter the "ABT"), a criminal organization whose members and associates engaged in narcotics distribution and acts of violence, involving murder and assault, and which operated throughout Texas, including the Southern District of Texas, and elsewhere.

#### Structure of the Enterprise

2. The structure of the ABT included, but was not limited to, the following:

   a. The ABT was a violent "whites only" prison-based gang with thousands of members operating inside and outside of state and federal penal institutions throughout Texas and the United States.

   b. The traditional power centers of the ABT, and members of the gang's

leadership structure, were predominately located in prisons operated by the Texas Department of Criminal Justice (hereinafter the "TDCJ") and metropolitan areas throughout Texas. The ABT was established in the early 1980's within TDCJ. The ABT modeled itself after and adopted many of the precepts and writings of the Aryan Brotherhood, a California-based prison gang that was formed in the California prison system during the 1960's. The ABT offered protection to "white" inmates if they joined the gang.

   c.  The ABT had a detailed and uniform organizational structure, which is outlined - along with various rules, procedures, and code of conduct - in a written "Constitution" widely distributed to members throughout Texas, and elsewhere.

   d.  In Texas there were two competing ABT factions. Each faction followed the leadership of their respective faction. Each faction had similar chain of command structures and had a defined militaristic ranking structure. ABT members referred to the gang as the "Family." The hierarchy of each faction was broken up into separate TDCJ regions. Each Region included a "General," several "Majors," "Captains," "Lieutenants," "Sergeant-at-Arms," and numerous "Soldiers." The General was the highest authority within the Region. Subordinate ranking members served to support the General, and enforce discipline and adherence by gang members of established ABT rules and by-laws. The ABT's ranking structure remained constant; however, personnel changes (promotions, demotions, terminations) frequently occurred.

   e.  The five ABT Generals comprised a steering committee that was referred to as the "Wheel," which controlled all criminal aspects of the gang. Each Wheel member was responsible for appointing his subordinate, ranking member (Majors) within his respective region. This included appointment of an inside Major (in-custody member) and an outside Major (referring

to a member in the "free world"). These Majors, in turn, were responsible for appointing their subordinate Captains and Lieutenants who, in turn, appointed their Sergeants. Wheel members typically remained in place regardless of their custody status, unlike other ranking members who typically lost rank when their custody status changed.

        f.      ABT leaders had the authority within the gang to issue "D.O.'s" (direct orders) and mete out punishment. A "D.O." was an assignment given to a subordinate ABT member that would serve a purpose for the ABT. The "D.O." could range from a leader ordering a "S.O.S" (smash on sight), meaning the assault of a rival gang member or of an ABT member who had committed a violation of the ABT rules, to a "green light," or "X," meaning the murder of a rival gang member or of an ABT member who had committed an egregious violation of the gang's rules. Failure to perform a "D.O." resulted in the assigned member being in violation of the rules. Punishment for failing to complete the "D.O." could range anywhere from a beating to death.

        g.      Members of the ABT greeted each other, and showed their membership in the gang, using a hand-sign, intended to represent the letters "A" and "B." The ABT employed a robust symbolgy as well, using depictions of neo-Nazi era inspired symbols and artwork to demonstrate their affiliation. Members often had tattoos incorporating one or more neo-Nazi era symbols including but not limited to the Nazi flag, Swastika, Iron Eagle and Schutzstaffel ("SS") lighting bolts. The most coveted tattoo of ABT membership was the ABT patch, which could be worn only by fully made members who generally ascended to full membership by committing a "blood-tie" (aggravated assault or murder) on behalf of the gang. The design and shape of the patch would vary, but usually consisted of a shield encompassing a sword, swastika, and crown - with the letters "A" and "B" and lightning bolts of the Nazi "SS" over the top of the shield - and "Texas" under the

3

bottom of the shield. Phrases unique to the ABT lexicon included "GFBD," "14-88," "12," "23," "23/16," "28," and "100%." The gang also incorporated these phrases into tattoos, which they used to show their membership in the gang. The colors associated with the ABT were black and red, and members of the ABT often demonstrated their affiliation with the ABT by wearing clothing containing the colors black and red, or incorporating some of the gang's other symbols or phrases.

    h.  Once released from incarceration, ABT members were required to remain loyal to the ABT and were required to immediately report to outside leaders to further the goals of the ABT through criminal activity. One of the goals of the ABT was to recruit new members. ABT members were recruited from both inside and outside state and federal penal institutions. In order to be considered for ABT membership, a person had to be sponsored by another ABT member. Once sponsored, a prospective member had to serve an unspecified term of usually not less than one year, wherein he was referred to as a prospect, while his conduct was observed by other gang members. During this period, the prospect was required to study and learn the ABT Constitution and the "Prospect Schooling Guide." The prospect was also required to sign a "Blind Faith Commitment," whereby he pledged an unconditional commitment to follow all orders issued by ABT superiors. While a prospect, the individual was considered part of the ABT family and entitled to the full protection of the gang. The prospect was also subjected to the rules and orders of the gang. If the prospect's conduct during the probationary period was deemed satisfactory he was admitted by a vote of the majority of all ABT members present.

    i.  In addition to members, the enterprise included those closely affiliated with the ABT, who were called "associates." While females were not allowed to become members of the ABT, those who associated with the ABT and engaged in criminal activity for the benefit of the ABT

4

were often referred to as "featherwoods." Associates who did not fulfill their obligations to the ABT were sometimes subject to violence, including murder. Female associates functioned as communication hubs, facilitating gang communication among imprisoned members throughout the penal system through the use of the telephone, Internet and United States mail.

### The Racketeering Enterprise

3. The ABT, including its leaders, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4) (hereinafter "the enterprise"), that is, a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members and associates, including its prospects, functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

### Purpose of the Enterprise

4. The purposes of the enterprise included, but were not limited to, the following:

    a. Enriching the leaders, members, and associates of the enterprise through, among other things, the illegal trafficking of controlled substances.

    b. Preserving and protecting the power, territory, operations, and proceeds of the enterprise through the use of threats, intimidation, violence, and destruction, including, but not limited to, acts of murder, attempted murder, assault with a dangerous weapon, and other acts of violence.

    c. Promoting and enhancing the enterprise and its members' and associates' activities.

    d. Keeping victims in fear of the enterprise and in fear of its leaders, members, and associates through threats of violence and actual violence. The leaders, members, and associates

of the enterprise undertook all steps necessary to prevent the detection of their criminal activities, and sought to prevent and resolve the imposition of any criminal liabilities upon their leaders, members, and associates, by the use of murder, violence, and intimidation directed against witnesses, victims, and others.

    e.    Providing support to gang members who were charged with, or incarcerated for, gang-related activities.

### Manner and Means of the Conspiracy

5.    The defendant agreed to facilitate a scheme that included the operation and management of the enterprise by a conspirator. Members and associates of the enterprise operated and conducted their affairs through a series of laws and policies, some of which were codified in a constitution and by-laws.

    a.    The members and associates of the enterprise attended regular meetings, referred to as "church," at which they discussed, planned, and otherwise engaged in criminal activity, including acts involving murder and narcotics distribution.

    b.    To enforce discipline and the rules of the enterprise, members and associates of the enterprise, and their associates engaged in a system of "violations," in which the defendant and others attempted to murder, conspired to murder, physically assaulted and threatened those members and associates of the enterprise who violated rules, questioned authority, or posed a threat to the leaders, members, or purposes of the enterprise.

    c.    Members and associates of the enterprise employed and used gang-related terminology, symbols, gestures, and color schemes.

    d.    To perpetuate the enterprise and to maintain and extend their power, members

6

and associates of the enterprise committed and conspired to commit acts including murder, intimidation, and assault against individuals who posed a threat to the enterprise or jeopardized its operations, including rival gang members, ABT gang members of a rival ABT faction, and witnesses to illegal activities of the enterprise.

  e. Members and associates of the enterprise managed the procurement, transfer, use, concealment, and disposal of firearms and dangerous weapons within the enterprise to protect gang-related criminal activities, personnel, and operations, and to deter, eliminate, and retaliate against competitors and other rival criminal organizations and persons.

  f. Members and associates of the enterprise earned money for themselves and regularly financed their activities through funds obtained in the illegal trafficking of controlled substances, including, but not limited to, the distribution and possession with the intent to distribute methamphetamine.

  g. Members and associates of the enterprise hid, misrepresented, concealed and caused to be misrepresented, concealed, and hidden, the objectives of acts done in furtherance of the conspiracy, and used coded language and other means to avoid detection and apprehension by law enforcement authorities.

## The Racketeering Conspiracy

6. Beginning on a date unknown to the Grand Jury, but at least as of in or about 1985, and continuing through on or about the date of this Indictment, in the Southern District of Texas and elsewhere, the defendant, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** being a person employed by and associated with the ABT, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, and others known and unknown to the Grand Jury, did knowingly

and intentionally conspire to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Sections 1961 (1) and (5) of Title 18, United States Code, consisting of multiple acts involving murder in violation of Texas Penal Code, Sections 19.02, 15.01 and 15.02, and multiple acts involving narcotics trafficking in violation of 21 United States Code Sections 841(a)(1) (distribution and possession with the intent to distribute a controlled substance) and Section 846 (conspiracy to distribute and possession with the intent to distribute a controlled substance). It was part of this conspiracy that the defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

## Overt Acts

7. In furtherance of the conspiracy and to achieve the objective thereof, the defendant performed or caused to be performed the following overt acts, among others, in the Southern District of Texas and elsewhere:

a. Beginning on a date unknown to the Grand Jury, but at least as of in or about 1985, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** became a prospecting member of the ABT enterprise.

b. Beginning on a date unknown to the Grand Jury, but at least as of in or about 1987, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** earned his "blood-tie" into the ABT by attempting to kill and severely injuring a rival gang member.

c. Beginning on a date unknown to the Grand Jury, but at least as of in or about 1985 and continuing through 1987, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** committed at least five assaults against certain inmates whom the ABT believed to be rival gang members and other

prisoner inmates.

  d.  Beginning on a date unknown to the Grand Jury, but at least as of in or about 1987, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** became a "fully-made" member of the ABT enterprise.

  e.  Beginning on a date unknown to the Grand Jury, but at least as of in or about 1985, and continuing through 1993, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** and other members of the ABT distributed methamphetamine.

  f.  Beginning on a date unknown to the Grand Jury, but at least as of in or about 1992, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** was promoted to the rank of "inside" Lieutenant for the ABT enterprise over the Michaels Unit of TDCJ.

  g.  Beginning on a date unknown to the Grand Jury, but at least as of in our about 1993, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** was promoted to the rank of "inside" Captain by the ABT enterprise over the Dalhart Unit of TDCJ.

  h.  Beginning on a date unknown to the Grand Jury, but at least as of in or about 1993, and continuing through 1994, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** controlled all ABT enterprise criminal activity at the Dalhart Unit of TDCJ.

  i.  Beginning on a date unknown to the Grand Jury, but at least as of in or about 1993, and continuing through 1994, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** ordered subordinate gang members to assault certain individuals whom the ABT believed to be rival gang members.

  j.  Beginning on a date unknown to the Grand Jury, but at least as of in or about 1995, and continuing through 1997, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** and other

members of the ABT enterprise distributed cigarettes at the Dalhart and Stiles Units of TDCJ.

k.   Beginning on a date unknown to the Grand Jury, but at least as of in or about 1999, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** assumed control over all ABT criminal activity at the Mineral Wells Unit of TDCJ for the ABT enterprise.

l.   Beginning on a date unknown to the Grand Jury, but at least as of in or about March 1999, and continuing through September 1999, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** ordered subordinate ABT gang members to attack and kill certain inmates at the Mineral Wells BOP facility whom the ABT believed to be rival gang members.

m.   Beginning on a date unknown to the Grand Jury, but at least as of in or about 1999, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** was promoted to the rank of "outside" Major for region two of the ABT enterprise.

n.   Beginning on a date unknown to the Grand Jury, but at least as of in or about September 1999, and continuing through May 2000, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** presided over numerous ABT "church" meetings where criminal activity was discussed and beatings of fellow ABT gang members were administered.

o.   Beginning on a date unknown to the Grand Jury, but at least as of in or about September 1999, and continuing through May 2000, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** and other ABT gang members distributed methamphetamine.

p.   In or about March 2000, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** attempted to kill a fellow ABT gang member.

q.   Beginning on a date unknown to the Grand Jury, but at least as of in or about 2000, a division within the ABT resulted in two separate rival ABT factions, and the ABT enterprise

faction to which **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** held allegiance issued a "green light" (order to kill) for individuals whom the ABT enterprise believed to be members of the rival faction.

 r. On or about April 2008, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** was promoted to the rank of "General" of Region Four and the Federal Penitentiary System of the ABT enterprise.

 s. Beginning on a date unknown to the Grand Jury, but at least as of in or about April 2008, and continuing to the present, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** ratified the "green light" (order to kill) for individuals whom the ABT believed to be gang members of the rival ABT faction.

 t. On or about October 12, 2008, members of the ABT enterprise killed an individual whom the ABT enterprise believed to be a member of the rival ABT faction.

 u. On or about January 9, 2009, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** was the victim of an attempted murder by fellow gang members.

 v. Beginning on a date unknown to the Grand Jury, but at least as of in or about January 2010, and continuing to the present, the ABT enterprise leadership issued a "green light" (order to kill) for those fellow gang members who attempted to kill **TERRY GLENN SILLERS, a/k/a "Lil Wood."**

 w. Beginning on a date unknown to the Grand Jury, but at least as of 2004 and continuing through 2006, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** and other ABT gang members filed fraudulent United States tax returns.

 x. Beginning on a date unknown to the Grand Jury, but at least as of in or about

2005, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** issued an order to kill an individual whom the ABT believed to be a member of the rival ABT faction.

y. Beginning on a date unknown to the Grand Jury, but at least as of in or about 2005 **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** ratified the "green light" (order to kill) for a fellow ABT gang member.

z. Beginning on a date unknown to the Grand Jury, but at least as of 2007, and continuing through 2010, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** sanctioned in advance the stabbing of numerous individuals whom the ABT enterprise believed to be rival gang members and other prisoner inmates in the BOP system.

aa. In or about February 2011, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** was the senior ABT leader at an ABT enterprise "church" meeting where several ABT gang members were beaten.

bb. In or about May 2011, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** ordered the beating of a fellow ABT gang member.

**NOTICE OF SPECIAL SENTENCING FACTORS**

cc. Beginning on or about March 2011, and continuing through and including June 2011, within the Northern District of Texas and elsewhere, the defendant, **TERRY GLENN SILLERS, a/k/a "Lil Wood,"** knowingly and intentionally conspired to distribute and possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and/or 50 grams or more of methamphetamine (actual), in violation of Title 21, United States Code, Section 846 and 841.

All in violation of Title 18, United States Code, Section 1962(d).

A TRUE BILL

Original Signature on File
_____
FOREPERSON OF THE GRAND JURY

KENNETH MAGIDSON  
UNITED STATES ATTORNEY

By: _____  
Jay Hileman  
Assistant United States Attorney

LANNY BREUER  
ASSISTANT ATTORNEY GENERAL

By: _____  
David Karpel  
Trial Attorney  
Organized Crime and Gang Section